J-A03028-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| HELBERT MERCADO | |
| Appellant | No. 3234 EDA 2014 |

Appeal from the Judgment of Sentence August 26, 2014
In the Court of Common Pleas of Chester County
Criminal Division at No(s): CP-15-CR-0003365-2013

BEFORE:  GANTMAN, P.J., MUNDY, J., and DUBOW, J.

MEMORANDUM BY MUNDY, J.:                         **FILED MAY 18, 2016**

Appellant, Helbert Mercardo, appeals from the August 26, 2014 aggregate judgment of sentence 4 years and 11 months to 9 years and 11 months' imprisonment, followed by 2 years' probation.  After careful review, we affirm on the basis of the trial court's March 2, 2015 opinion.

The relevant procedural history was succinctly summarized as follows.

> [Appellant] was charged with criminal trespass, in violation of 18 Pa.C.S.A. § 3503(a)(1)(ii); simple assault, in violation of 18 Pa.C.S.[A.] § 2701(a)(3); harassment, in violation of 18 Pa.C.S.[A.] § 2709(a)(1); unauthorized use of automobiles and other vehicles, in violation of 18 Pa.C.S.[A.] § 3928; criminal mischief, in violation of 18 Pa.C.S.[A.] § 3304(a)(5); burglary, in violation of 18 Pa.C.S.[A.] § 3502(a)(1); robbery, in violation of 18 Pa.C.S.A. § 3701(a)(1)(iv); false imprisonment, in violation of 18 Pa.C.S.[A.] § 2903; and theft by unlawful taking or disposition, in violation of 18 Pa.C.S.[A.] 3921(a).

Prior to trial, the Commonwealth withdrew the theft by unlawful taking count. A trial was held June 9, 2014 through June 11, 2014. The jury found [Appellant] guilty of criminal trespass, simple assault, and unauthorized use of automobiles and other vehicles. The jury found [Appellant] not guilty of false imprisonment, robbery and burglary. The [trial] court found [Appellant] guilty of the summary charges of harassment and criminal mischief.

[Appellant] was sentenced on August 26, 2014. On count 1, criminal trespass, he was sentenced to 2 ½ to 6 years['] incarceration, followed by 2 years['] probation, and was ordered to pay costs and restitution. On count 2, simple assault, he was sentenced to 1 to 2 years['] incarceration to be served consecutive to count 1. Count 3, harassment, merged for sentencing purposes. On count 4, unauthorized use of an automobile or other vehicle, he was sentenced to 11 ½ to 23 months['] incarceration to be served consecutive to count 2. The [trial] court did not impose any sentence on count 5, criminal mischief. He was further ordered to undergo drug/alcohol and mental health evaluations and ordered to comply with the recommended treatment.

[Appellant] filed a Motion for Post Sentence Relief of September 5, 2014. In the motion, he argued that the sentence was excessive and that the weight of the evidence did not support the convictions of criminal trespass, simple assault and unauthorized use of an automobile. A hearing was held on October 21, 2014. At the hearing, [Appellant] withdrew his weight of the evidence challenge. On that date the [trial] court denied his request to reduce the sentence.

Trial Court Opinion, 3/2/15, at 1-2. On November 18, 2014, Appellant filed a timely notice of appeal.[1]

On appeal, Appellant raises the following issues for our review.

    I.     Whether [Appellant] filed a timely appeal?

    II.    Whether there was insufficient evidence to sustain a conviction for simple assault under 18 Pa.C.S.A. § 2701(a)(3) and whether the trial court erred and abused its discretion when denying [Appellant]'s motion for judgment of acquittal for simple assault under 18 Pa.c.S.A. § 2701(a)(3)?

    III.    Whether the trial court erred and abused its discretion by permitting the Commonwealth to amend and add to Count 3 of the Information, simple assault under 18 Pa.C.S.A. § 2701(a)(1)?

    IV.    Whether the trial court erred and abused its discretion by denying [Appellant] the opportunity to cross-examine the victim and victim's sister regarding the victim's relationship with Mo in order to call into question the victim's credibility?

Appellant's Brief at 7.

In his first issue, Appellant asserts his appeal was timely filed. ***Id.*** at 17-18. As noted, Appellant was sentenced on August 26, 2014. Therefore, Appellant had until September 5, 2014 to file a timely post-sentence motion. ***See generally*** Pa.R.Crim.P. 720(A)(1). The original docket stated

---

[1] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

Appellant's post-sentence motion was filed on September 19, 2014, when the notice of hearing on Appellant's post-sentence motion was filed. On January 13, 2015, this Court filed a Rule to Show Cause as to why Appellant's November 18, 2014 notice of appeal should not be considered untimely filed. On January 20, 2015, Appellant filed a reply attaching a certified copy of his post-sentence motion filed on September 5, 2014, and an amended copy of the Chester County docket reflecting a correction of said date. Accordingly, Appellant's September 5, 2014 post-sentence motion was timely filed, and the notice of appeal filed November 18, 2014, was filed within 30 days of the date Appellant's post-sentence motion was denied by the trial court on October 21, 2014. As a result, Appellant's notice of appeal was timely filed.

Turning to the merits, we address Appellant's second and third issues together. In said issues Appellant asserts the trial court erred in allowing the Commonwealth to amend the simple assault count from 18 Pa.C.S.A. § 2701(a)(3), to include simple assault pursuant to subsection (a)(1) as well. Appellant's Brief at 22. Further, Appellant argues there was insufficient evidence to convict him of simple assault under subsection (a)(3). *Id.* at 18-20.

Our review is guided by the following.

> The criminal information "is a formal written statement charging the commission of an offense signed and presented to the court by the attorney for the Commonwealth after a defendant is held for

court...." Pa.R.Crim.P. 103. The information apprises the defendant of the filed charges so he can prepare a defense. *See Commonwealth v. Sinclair*, 897 A.2d 1218, 1223 (Pa. Super. 2006).

Pennsylvania Rule of Criminal Procedure 564 permits the amendment of the information "when there is a defect in form, the description of the offense(s), the description of any person or any property, or the date charged, provided the information as amended does not charge an additional or different offense." Pa.R.Crim.P. 564. "[T]he purpose of Rule 564 is to ensure that a defendant is fully apprised of the charges, and to avoid prejudice by prohibiting the last minute addition of alleged criminal acts of which the defendant is uninformed." *Sinclair*, 897 A.2d at 1221 (citation omitted). A court must look to see

> [w]hether the crimes specified in the original indictment or information involve the same basic elements and evolved out of the same factual situation as the crimes specified in the amended indictment or information. If so, then the defendant is deemed to have been placed on notice regarding his alleged criminal conduct. If, however, the amended provision alleges a different set of events, or the elements or defenses to the amended crime are materially different from the elements or defenses to the crime originally charged, such that the defendant would be prejudiced by the change, then the amendment is not permitted.

*Id.* (citation omitted).

*Commonwealth v. Veon*, 109 A.3d 754, 768 (Pa. Super. 2015), *appeal granted in part*, 121 A.3d 954 (Pa. 2015).

Further, when reviewing a claim of insufficient evidence, we look to the following standard of review. "In reviewing the sufficiency of the evidence,

- 5 -

we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt." **Commonwealth v. Patterson**, 91 A.3d 55, 66 (Pa. 2014) (citation omitted), *cert. denied*, **Patterson v. Pennsylvania**, 135 S. Ct. 1400 (2015). "The Commonwealth can meet its burden by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." **Commonwealth v. Watley**, 81 A.3d 108, 113 (Pa. Super. 2013) (*en banc*) (internal quotation marks and citation omitted), *appeal denied*, 95 A.3d 277 (Pa. 2014). As an appellate court, we must review "the entire record … and all evidence actually received[.]" **Id.** (internal quotation marks and citation omitted). "[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence." **Id.** (citation omitted). "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Diamond**, 83 A.3d 119, 126 (Pa. 2013) (citation omitted), *cert. denied*, **Diamond v. Pennsylvania**, 135 S. Ct. 145 (2014).

The crime of simple assault is codified in the Pennsylvania Crimes Code and provides, in relevant part, as follows.

**§ 2701. Simple assault**

**(a) Offense defined.--**A person is guilty of assault if he:

> (1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another;
>
> …
>
> (3) attempts by physical menace to put another in fear of imminent serious bodily injury[.]

18 Pa.C.S.A. § 2701(a)(1),(3).

> Furthermore, it is axiomatic that simple assault does not require a victim to suffer actual bodily injury. The attempt to inflict bodily injury may be sufficient. This intent may be inferred from the circumstances surrounding the incident if a specific intent to cause bodily injury may reasonably be inferred therefrom.

***Commonwealth v. Polston***, 616 A.2d 669, 679 (Pa. Super. 1992) (internal citations omitted), *appeal denied*, 626 A.2d 1157 (Pa. 1993).

The trial court's March 2, 2015 Rule 1925(a) opinion, thoroughly addresses both of these issues. ***See*** Trial Court Opinion, 3/2/15, 3-14. Specifically, the trial court noted the "amendment to the information did not change the factual scenario supporting the charges, nor did it add new facts previously unknown to [Appellant]." ***Id.*** at 7. "The entire factual scenario was developed during the preliminary hearing … the amendment allowed the jury to consider two types of simple assault consistent with the facts – attempt to cause or caused bodily injury as well as put the victim in fear of

imminent serious bodily injury." *Id.* Additionally, "[d]efense counsel did not allege that a change in defense strategy was necessitated by the amendment." *Id.* Accordingly, the trial court found it was proper to grant the Commonwealth's request to amend the complaint.

As to the sufficiency of the evidence, the trial court fully and accurately recounted the applicable law and facts as applied to this matter. *Id.* at 9-22. Further, the trial court noted Appellant is "not challenging the conviction of simple assault, bodily injury caused under [Section] 2701(a)(1). Therefore, he acknowledges that his actions … resulted in the victim suffering bodily injury." *Id.* at 22. Accordingly, Appellant is only challenging that the trial court erred in finding Appellant "attempted by physical menace to put another in fear of imminent serious bodily injury." *Id.* In reaching its conclusion that the evidence was sufficient, the trial court found as follows.

> There is no question that [Appellant] intentionally placed [the victim] in fear of imminent serious bodily injury through the use of menacing or frightening activity.
>
> There were numerous physical altercations and struggles between [Appellant] and the victim including struggling in her bedroom, master bathroom and powder room before [Appellant] left the house. [The victim] locked the door knob and the deadbolt and probably believed the incident to be done. [Appellant] decided to violently crash through her double locked front door, got in her face saying, "What now, b[**]ch?" The victim once again tried to escape his wrath and was holding onto the door

jamb, as he was trying to pull her back into the house.

Instead of finally letting her go, [Appellant] grabbed her by the hair on the back of her head and yanked as hard as he could, which tossed her to the floor on her tailbone. Did he stop at this point? No. He continued to yell at her and kicked her so hard a couple of times that she slid across the floor and hit the bottom of the table with the back of her head. Did he stop at this point? No. As she was trying to crawl through the dining room to escape him, he stood over her and squatted down toward her. As [the victim] testified, when this was happening she really thought she was going to die. She had never seen such hatred and black in someone's eyes. She really thought he was going to kill her.

Based upon the totality of circumstances, it is abundantly clear that it was [Appellant]'s intention to place [the victim] in fear of imminent serious bodily injury through his use of menacing and frightening actions. Accordingly, it was proper for the jury to find [Appellant] guilty of simple assault, pursuant to [Section] 2701(a)(3).

*Id.* at 23.

Finally, in his last issue Appellant argues the trial court erred by not allowing him to cross-examine the victim or the victim's sister about the victim's ex-boyfriend. Appellant's Brief at 24. In reviewing a trial court's ruling on the admissibility of evidence, our standard of review is one of deference. **Commonwealth v. Selenski**, 18 A.3d 1229, 1232 (Pa. Super. 2011). Questions concerning the admissibility of evidence are within "the sound discretion of the trial court, and its discretion will not be reversed absent a clear abuse of discretion." **Id.** (citation omitted). "An abuse of

discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." **Commonwealth v. Harris**, 884 A.2d 920, 924 (Pa. Super. 2005) (citations and internal quotation marks omitted), *appeal denied*, 928 A.2d 1289 (Pa. 2007). "[I]f in reaching a conclusion the trial court over-rides [sic] or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error." **Commonwealth v. Weakley**, 972 A.2d 1182, 1188 (Pa. Super. 2009) (citation omitted), *appeal denied*, 986 A.2d 150 (Pa. 2009). Further, "[a] trial judge has considerable latitude in determining the scope of cross-examination and his determination will not be reversed in the absence of an abuse of discretion unless a party suffers an obvious disadvantage." **Yacoub v. Lehigh Valley Med. Assocs., P.C.**, 805 A.2d 579, 597 (Pa. Super. 2002), *appeal denied*, 825 A.2d 639 (Pa. 2003) (citation and internal quotation marks omitted).

Appellant lists three examples of evidence he was precluded from admitting via cross-examination of the victim and her sister. Appellant's Brief at 24-28. In its Rule 1925(a) opinion the trial court lists each example, the sidebar discussions surrounding each objection, and its ultimate reasoning for precluding the evidence from being admitted. Trial Court Opinion, 3/2/15, at 24-35. Upon thorough review of the briefs, the certified

record, and the trial court's opinion, we conclude the trial court did not abuse its discretion.

Based on the foregoing, we conclude the trial court's March 2, 2015 Rule 1925(a) opinion fully and accurately disposes of each of Appellant's issues on appeal. Accordingly, we adopt the opinion of the Honorable Phyllis R. Streitel for purposes of our review and affirm the trial court's August 26, 2014 judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/18/2016

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

: CHESTER COUNTY, PENNSYLVANIA

vs

: CRIMINAL ACTION

HELBERT MERCADO

: NO. 3365-13

: SUPERIOR CT. NO. 3234 EDA 2014

Nicholas Casenta, Esquire, attorney for the Commonwealth.
Mitchell H. Baylarian, Esquire, attorney for Defendant.

## STATEMENT OF THE COURT

On November 18, 2014, Defendant filed a timely appeal of this case following the entry of this Court's October 21, 2014 order denying his request to modify sentence. An appeal having been taken, pursuant to Pa.R.A.P. 1925(a), the following statement is submitted.

Defendant was charged with criminal trespass, in violation of 18 PaC.S.A. § 3503(a)(1)(ii); simple assault, in violation of 18 Pa.C.S. § 2701(a)(3); harassment, in violation of 18 Pa.C.S. § 2709(a)(1); unauthorized use of automobiles and other vehicles, in violation of 18 Pa.C.S. § 3928; criminal mischief, in violation of 18 Pa.C.S. § 3304(a)(5); burglary, in violation of 18 Pa.C.S. § 3502(a)(1); robbery, in violation of 18 Pa.C.S.A. § 3701(a)(1)(iv); false imprisonment, in violation of 18 Pa.C.S. § 2903; and theft by unlawful taking or disposition, in violation of 18 Pa.C.S.A. § 3921(a).

Prior to trial, the Commonwealth withdrew the theft by unlawful taking count. A trial was held June 9, 2014 through June 11, 2014. The jury found Defendant guilty of criminal trespass, simple assault, and unauthorized use of automobiles and other vehicles. The jury found Defendant not guilty of false imprisonment, robbery and

burglary. The court found Defendant guilty of the summary charges of harassment and criminal mischief.

Defendant was sentenced on August 26, 2014. On count 1, criminal trespass, he was sentenced to 2 ½ to 6 years incarceration, followed by 2 years probation, and was ordered to pay costs and restitution. On count 2, simple assault, he was sentenced to 1 to 2 years incarceration to be served consecutive to count 1. Count 3, harassment, merged for sentencing purposes. On count 4, unauthorized use of an automobile or other vehicle, he was sentenced to 11 ½ to 23 months incarceration to be served consecutive to count 2. The court did not impose any sentence on count 5, criminal mischief. He was further ordered to undergo drug/alcohol and mental health evaluations and ordered to comply with the recommended treatment.

Defendant filed a Motion for Post Sentence Relief on September 5, 2014. In the motion, he argued that the sentence was excessive and that the weight of the evidence did not support the convictions of criminal trespass, simple assault and unauthorized use of an automobile. A hearing was held on October 21, 2014. At the hearing, Defendant withdrew his weight of the evidence challenge. On that date the court denied his request to reduce the sentence.

On November 18, 2014, Defendant filed a Notice of Appeal. On that same date, this court entered an Order requiring Defendant to submit a Concise Statement of Errors Complained of on Appeal within twenty-one (21) days. Due to a transcript issue, Defendant filed a Motion for Extension to File 1925(b) Statement on December 9, 2014. Said Motion was granted on December 10, 2014. Defendant filed his Concise Statement on December 17, 2014. Defendant sets forth six items of complaint.

2

## Simple Assault

The first two issues concern the conviction for simple assault. First, Defendant argues that "[t]he evidence presented at trial was insufficient to sustain a conviction for Simple Assault, 18 Pa.C.S.A. § 2701(a)(3). The Court erred and abused its discretion by denying Defendant's motion for judgment of acquittal, at the conclusion of the Commonwealth's case, on the charge of 18 Pa.C.S.A. § 2701(a)(3)." Second, Defendant argues that "[t]he court erred and abused its discretion by permitting the Commonwealth to amend and add to Court 3 of the Information, Simple Assault, 18 Pa.C.S.A. § 2701(a)(1)."

We shall address the Information amendment first. Pennsylvania law is clear that "[a]ccording to Pa.R.Crim.P. 564, the court may permit amendment of an information 'when there is a defect in form, the description of the offense(s), the description of any person or any property, or the date charged, provided the information as amended does not charge an additional or different offense.'" Commonwealth v. Mentzer, 18 A.3d 1200, 1202 (Pa.Super. 2011), quoting Pa.R.Crim.P. 564. "'The purpose of Rule 564 is to ensure that a defendant is fully apprised of the charges, and to avoid prejudice by prohibiting the last minute addition of alleged criminal acts of which the defendant is uninformed.'" Mentzer, 18 A.3d at 1202, quoting Commonwealth v. Sinclair, 897 A.2d 1218, 1221 (Pa.Super. 2006).

"'Our courts apply the rule with an eye toward its underlying purposes and with a commitment to do justice rather than be bound by a literal or narrow reading of the procedural rules.'" Mentzer, 18 A.3d at 1202, quoting Commonwealth v. Grekis, 601 A.2d 1284, 1288 (Pa.Super. 1992). When presented with a question concerning the

3

propriety of an amendment, courts must consider the following: "'whether the crimes specified in the original indictment or information involve the same basic elements and evolved out of the same factual situation as the crimes specified in the amended indictment or information. If so, then the defendant is deemed to have been placed on notice regarding his alleged criminal conduct. If, however, the amended provision alleges a different set of events, or the elements or defenses to the amended crime are materially different from the elements or defenses to the crime originally charged, such that the defendant would be prejudiced by the change, then the amendment (sic) is not permitted.'" Mentzer, 18 A.3d at 1202, quoting Sinclair, 897 A.2d at 1221, quoting Commonwealth v. Davalos, 779 A.2d 1190, 1194 (Pa.Super. 2001), app. denied, 790 A.2d 1013 (Pa. 2001).

"Additionally, 'in reviewing a grant to amend an information, the Court will look to whether the appellant was fully apprised of the factual scenario which supports the charges against him. Where the crimes specified in the original information involved the same basis elements and arose out of the same factual situation as the crime added by the amendment, the appellant is deemed to have been placed on notice regarding his alleged criminal conduct and no prejudice to defendant results.'" Mentzer, 18 A.3d at 1202-1203, quoting Sinclair, 897 A.2d at 1222.

The factors a court must consider in determining whether an amendment to an information would be prejudicial are as follows: "'(1) whether the amendment changes the factual scenario supporting the charges; (2) whether the amendment adds new facts previously unknown to the defendant; (3) whether the entire factual scenario was developed during a preliminary hearing; (4) whether the description of the charges

4.

changed with the amendment; (5) whether a change in defense strategy was necessitated by the amendment; and (6) whether the timing of the Commonwealth's request for amendment allowed for ample notice and preparation.'" Id.

In the case at hand, Defendant was initially charged with simple assault under 18 Pa.C.S.A. § 2701(a)(3), attempt by physical menace to put the victim in fear of imminent serious bodily injury. The original information did not include simple assault under section (a)(1), attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another. Prior to the start of trial, the Commonwealth requested that the simple assault count include (a)(1) with the (a)(3) that was originally charged.

A review of the record reveals that the Affidavit of Probable Cause attached to the Police Criminal Complaint sets forth the following partial facts: "...When Benites tried to get past the defendant and started screaming for help, he grabbed her by the hair and drug her further into the residence, and threw her to the floor. She hit her tailbone on the floor and the back of her head on an unknown object, possibly the table in the entranceway."

Prior to the start of the trial, the following exchange took place between counsel and the court:

> MS. LEIGH: Your Honor, the Commonwealth, the only other issue that I did wish to bring up to Mr. Baylarian late last week was that the Commonwealth would be asking to amend the information to include simple assault (a)(1). Because robbery, bodily injury is already charged as Count 7, that's something that we read as prior, lesser included, but to make things as seemless (sic) as possible –
> THE COURT: Did you turn over the information?
> MS. LEIGH: The one I already amended?
> THE COURT: Yes. I mean, but, originally, I mean, the police reports, excuse me –
> MS. LEIGH: Did I turn them over?
> THE COURT: Yes, in discovery.

5

MS. LEIGH: Yes.

THE COURT: So you read the affidavit that says she was thrown on the floor or something; right?

MR. BAYLARIAN: Right. I don't agree that it should be added. It's not —

THE COURT: But you were on notice, that's what I am getting to. You were put on notice that there was this violent act alleged in the complaint to the police.

MR. BAYLARIAN: Yes. But I don't think it's a lesser included with robbery, because there is an additional act.

THE COURT: Well, let's say there wasn't a robbery in here and she came in and said, I want to add (a)(1) —

MR. BAYLARIAN: I would object to it because they did not put that in at the time of preliminary hearing. So it has not met that standard because it's a completely different offense than (a)(3).

We're talking about somebody putting somebody in fear, physical menace, immediate serious, as opposed to knowingly, recklessly causing bodily injury.

THE COURT: Was there a preliminary hearing?

MS. LEIGH: There was.

THE COURT: Was there evidence of her being thrown on the floor?

MR. BAYLARIAN: There was. There was testimony from the victim. If that's what we are proceeding on, I want to make it clear if they say (a)(1) based on him throwing her on the floor, I just want that to be specific then.

THE COURT: I am just using that in general. Let's see.

He grabbed her by the hair, drug her further into the residence and threw her to the floor. She hit her tailbone on the floor and the back of her head on an unknown object.

MS. LEIGH: I believe the victim's testimony was that she was kicked.

THE COURT: Kicked?

MS. LEIGH: Kicked. Okay.

MR. BAYLARIAN: Robbery doesn't, does not, include intentionally causing bodily injury. With simple assault, it does.

MS. LEIGH: It does include inflicting bodily injury.

MR. BAYLARIAN: But not intended.

THE COURT: We're on simple assault.

MR. BAYLARIAN: That's correct.

THE COURT: You said — I thought someone said serious bodily injury.

MR. BAYLARIAN: There is, for 3, (a)(3) simple assault, which is charged on the information.

THE COURT: Okay.

6

So you can add — I will allow you to add (a)(1) to the information.

Are you asking to remove (a)(3)?

MS. LEIGH: No, your Honor.

THE COURT: You want to add (a)(1). I find there has been notice and certainly that's in play here from the beginning. So it's allowed.

(N.T., 6/9/14, pgs. 14-17).

It is clear that this amendment to the Information did not change the factual scenario supporting the charges, nor did it add new facts previously unknown to the defendant. The entire factual scenario was developed during a preliminary hearing and the Defendant was put on notice of these facts in the Police Criminal Complaint. The number of counts did not change with the amendment, but the amendment allowed the jury to consider two types of simple assault consistent with the facts — attempt to cause or caused bodily injury as well as put the victim in fear of imminent serious bodily injury.

Defense counsel did not allege that a change in defense strategy was necessitated by the amendment. Finally, the timing of the Commonwealth's request for amendment allowed for ample notice and preparation for the defense. While the Commonwealth formally requested the amendment immediately prior to trial, the record reflects that it was discussed by the attorneys the week prior to trial. In addition, the defense has always been aware of the allegations of the physical assault of the victim.

Based upon the totality of the circumstances, it was proper to grant the Commonwealth's request to amend the complaint. Defendant's argument on appeal is without merit.

We now turn to Defendant's argument that the evidence presented at trial was insufficient to sustain a conviction for Simple Assault, 18 Pa.C.S.A. § 2701(a)(3). The

7

standard for reviewing the sufficiency of the evidence is "whether the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to enable the fact-finder to find every element of the crime beyond a reasonable doubt." Commonwealth v. Matthew, 909 A.2d 1254, 1256-57 (Pa. 2006), citing Commonwealth v. Williams, 896 A.2d 523, 535 (Pa. 2006), cert. denied, 127 S.Ct. 1253 (2007), and Commonwealth v. Randolph, 873 A.2d 1277, 1281 (Pa. 2005).

In addition, all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the Commonwealth. Commonwealth v. McCollum, 926 A.2d 527, 530 (Pa.Super. 2007), quoting Commonwealth v. Earnest, 563 A.2d 158, 159 (Pa.Super. 1989). "The test is whether the evidence, thus viewed, is sufficient to prove guilt beyond a reasonable doubt." McCollum, 926 A.2d at 530, citing Commonwealth v. Swerdlow, 636 A.2d 1173 (Pa.Super. 1994). "'This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt.'" McCollum, 926 A.2d at 530, quoting Swerdlow, 636 A.2d at 1176.

A conviction must be based on more than mere suspicion or conjecture, however, the Commonwealth does not need to establish guilt to a mathematical certainty. McCollum, 926 A.2d at 530, quoting Commonwealth v. Badman, 580 A.2d 1367, 1372 (Pa.Super. 1990). "Moreover, the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." Commonwealth v. Marrero, 914 A.2d 870, 872 (Pa.Super. 2006), citing Commonwealth v. Bullick, 830 A.2d 998, 1000 (Pa.Super. 2003). However, if the evidence "is in contradiction to the physical facts, in contravention to human nature, then the evidence is insufficient as a

8

matter of law." Commonwealth v. Heater, 899 A.2d 1126, 1131 (Pa.Super. 2006), quoting Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000).

The court may not weigh the evidence and substitute its judgment for the fact-finder. Id. "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." Marrero, 914 A.2d at 872, citing Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa.Super. 2001), app. denied, 806 A.2d 858 (Pa. 2002). When evaluating the credibility of the witnesses and evidence as well as the weight of the evidence, the fact-finder is free to believe all, part, or none of the evidence presented. Commonwealth v. Faulk, 928 A.2d 1061, 1069 (Pa.Super. 2007), quoting Commonwealth v. Stevenson, 894 A.2d 759, 773 (Pa.Super. 2006), app. denied, 917 A.2d 846 (Pa. 2007).

The uncorroborated testimony of one victim, if believed by the trier of fact, is sufficient to convict a defendant, if all the elements of a crime are established beyond a reasonable doubt. Commonwealth v. Mack, 850 A.2d 690, 693 (Pa.Super. 2004), citing Commonwealth v. Davis, 650 A.2d 452, 455 (Pa.Super. 1994), app. granted, 659 A.2d 557, affirmed, 674 A.2d 214 (Pa. 1996).

This court shall apply the above standards when examining the sufficiency of the evidence. The jury found Defendant guilty of simple assault under 18 Pa.C.S.A. § 2701(a)(1) and (a)(3). However, on appeal, Defendant is only challenging the conviction under (a)(3). The Pennsylvania Crimes Code, at 18 Pa.C.S.A. § 2701(a)(3) states that "a person is guilty of assault if he ... attempts by physical menace to put another in fear of imminent serious bodily injury."

9

The Crimes Code defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. The term "bodily injury" is defined as " [i]mpairment of physical condition or substantial pain." Id.

Pennsylvania courts have held that the sufficiency of the evidence to prove simple assault by physical menace can be met when the following elements are proven: intentionally placing another in fear of imminent serious bodily injury through the use of menacing or frightening activity. Commonwealth v. Reynolds, 835 A.2d 720, 726 (Pa.Super. 2003), quoting Commonwealth v. Repko, 817 A.2d 549, 554 (Pa.Super. 2003), quoting Commonwealth v. Little, 614 A.2d 1146, 1148 (Pa.Super. 1992). "'Intent can be proven by circumstantial evidence and may be inferred from the defendant's conduct under the attendant circumstances.'" Reynolds, 835 at 726, quoting Repko, 817 A.2d at 554, quoting Little, 614 A.2d at 1154.

The evidence taken in the light most favorable to the Commonwealth, shows the following applicable facts:

Jessica Benites[1] testified that she is thirty-three years old and is a registered nurse. She lives in Thorndale, Chester County and has known Defendant for a couple of years. She had been in a romantic relationship with him, but by July 2013 she was attempting to end the relationship and was trying to distance herself from him. Starting the beginning of July 2013, she would not let Defendant come to her house as often as before. The week prior to the incident, she was still communicating with him via text but

---

[1] The testimony of Jessica Benites is located at N.T., 6/10/14, pgs. 28-182.

10

would not let him come over. She was not calling him much at all.

Prior to July 2013, Defendant had stayed at the victim's house but he did not have a key to the house. She kept her Infinity G35X sedan at the house and she had given Defendant a key to the vehicle. He was allowed to use the vehicle if he asked Ms. Benites for permission. Defendant was granted permission unless the victim needed to use the car. He would not take the car if she told him no.

Between July 10, 2013 and July 18, 2013 Defendant would visit Ms. Benites at her house but she would not let him sleep over. She had asked him for the car key back, but the conversation did not go well and Defendant had retained the key. On Friday, July 19, 2013, Defendant was allowed to spend the night because the arrangements he made to stay with family fell through. The victim felt bad because there was a heat wave at the time, so she allowed him to sleep over with the understanding that he would make arrangements for the next night. Defendant agreed and left by 10:00 A.M. on Saturday, July 20, 2013.

Defendant proceeded to text the victim throughout the day. He asked if she would consider letting him stay another night. He assured her that he would honor her wishes and leave the following morning and said he would not stay again after that. He continued to ask her throughout the day and finally around 9:00 PM, she said okay, with the understanding that he would leave the following morning and that it was the absolute last time he could stay over.

Defendant arrived at her house about 9:30 PM. Ms. Benites stayed with Defendant in the downstairs part of her house. Defendant was sick and kept going out to

11

her patio to wretch over the side. She was trying to help him. Eventually, Defendant felt better and asked her for alcohol. She told him that he should not drink alcohol because he had not been feeling well.

Ms. Benites returned to the living room and continued to watch a movie. She did not pay attention to what Defendant was doing. At approximately 11:00 PM, he asked to borrow her car to go to Wawa to get a cigar. She denied his request. She realized he had been drinking. Defendant said fine, he would walk. At that point, Defendant still had the spare key to her car in his pocket.

Defendant returned after midnight and was not in a good mood. He tried to argue with Ms. Benites about their relationship. He kept picking at things and accused her of wanting to be with other men. He asked her to give him a ride to Coatesville and she refused. She told him that she was going to bed and that he could sleep on the sofa. She went upstairs to her master bedroom with attached bathroom, to get ready for bed. She was in the bathroom for about ten minutes. When she exited, she saw Defendant sitting on her bed.

He again asked her for a ride and she said, no. She told him that she did not want to fight with him. He next requested if he could sleep in her bed with her one more time and she said, no. Ms. Benites then told him to stay in her bed and that she would go sleep in her daughter's bedroom.[2] She gathered her pillow and some items to leave the room. At that point, Defendant said, "No," and pushed her.

Ms. Benites told him that she did not want to be with him anymore, did not want to see him and wanted things to be done. She told Defendant that she did not want to fight,

---

[2] The child was away visiting her grandparents in New Jersey.

12

and if he was going to fight with her, he needed to leave. She told him to just get out, he was not welcome there anymore. She told him to sleep downstairs or leave. She did not want to deal with it anymore. She asked for her car key back and he gave it to her. After she watched him exit the room, she threw the car key under the bed. She did not think Defendant saw where she put it.

Defendant had gone downstairs. Ms. Benites was tired so she laid down, but she left the bedside lamp on. She put her phone on the charger next to the bedside lamp. She fell asleep. At some point that night she woke up to find Defendant in her bedroom again. She told him to get out. When she tried to grab her phone to call for help, Defendant jumped over the bed toward her and knocked the phone away from her. He grabbed the phone and threw it as hard as he could at the wall across from the bed. The phone hit the wall and dropped down.

They both then tried to get the phone, but Defendant got it first and put it in his pocket. The victim tried to go into her bathroom and close its door, but he kept pushing his way through. She was screaming for him to get out as loud as she could. She started banging on the wall to try to attract the attention of her neighbor. She then tried to get around Defendant because she did not want to be stuck in the bathroom with him. He blocked her exit. Eventually she got past him but he blocked her exit from the bedroom.

Ms. Benites tried to push past him and tried to get her phone. She continued to tell him to get out. She asked him for her phone several times. Defendant would not return her phone. She was finally able to get past Defendant and went downstairs quickly. She knew that she had a government- assigned work phone in her work bag downstairs. She retrieved the phone from her bag in the dining room and went to the

13

powder room to try to lock herself in to turn on the phone and call 911. This phone was an older flip phone that took time to power on.

When she reached the powder room, she could not close the door because Defendant would not let her. He was pushing himself through the door and she was trying to push him out. He continued to reach for her as she repeatedly told him to "get out, go, leave." Eventually, Defendant got fed up and said, "fine, I'll leave." Ms. Benites watched him walk out the front door, through the yard and past the tree. She slammed the door and locked the knob and the deadbolt.

Ms. Benites turned to walk up the stairs, intending to go to her bedroom. At the same time she was trying to turn on the phone. At about her second or third step she heard a "God awful crash." As she turned around, Defendant was inside, in her face saying, "What now, bitch?" She tried to get past him to run out the door and she was still trying to turn on the phone. When she got to the door defendant was trying to pull her back by her upper torso and telling her to shut up. She was holding on to what was left of the door jamb and was screaming as loud as she could for somebody to please help her.

Ms. Benites was almost out the door when Defendant grabbed a chunk of her hair on the back of her head and yanked her into the house. She fell down on her tailbone. He continued to tell her to shut up. After she hit the floor, he kicked her a couple of times on her lower legs and she slid across the floor and hit the bottom of a table with the back of her head. She rolled over and tried to crawl through the dining room to get to the kitchen. She turned to her side in a fetal position when Defendant was standing over her and squatted down telling her to "be quiet, calm down." The victim was hysterically screaming at him to "get out, get the fuck away. Get away. Don't touch me. Get away."

14

Ms. Benites testified that at the time this was happening, "I thought I was going to die. I really did. I never seen such hatred and black in someone's eyes. I really thought he was going to kill me."

Thereafter, Defendant said that he would leave after he collected his stuff. From where she was laying, she could see Defendant going upstairs empty handed. He came back downstairs in less than a minute. She could not see anything in his hands. Defendant told her to "tell the cops" that he was taking her car, too. He walked out what was left of the door and drove away in her car as she dialed 911.

Ms. Benites spoke to the dispatcher and then sat on her steps sobbing until the police arrived about three minutes later. The police asked her what happened. She was crying and could not speak at first. She then told them what happened and described her injuries. She was incredibly shaken up and her body was very sore. Her head hurt and her tailbone hurt very badly. She did not have any bleeding or open wounds, so the police did not photograph her that night.

However, the following day bruises appeared on her body, specifically on the bottom of her right leg on the external portion of her calf and near her ankle, on her inner thigh, on her left leg and on her right upper arm. Her left arm was swollen. As registered nurse with a Bachelor of Science in nursing, as well as her training in the military as a combat medic, she is familiar with the life cycle of a bruise. In her experience, it is not unusual for her body to take a couple of days for bruises to develop. When she has received bruises in the past, she may not have realized that she was injured until a day later when she saw a purple/blue mark on her body. Over time it would get brown and slowly heal as the blood dissolved back into the body. She has pain associated with her

15

bruises and the pain lessens as the bruises heal.

In addition to the bruises, Ms. Benites' overall pain was more noticeable the following day. It hurt her tailbone to move at all, either sitting or standing, When she walked, her tailbone hurt a lot. Her whole body ached. Six photographs of her injuries/bruises were taken between July 21st and July 28th, 2013 and admitted into evidence at trial. Ms. Benites testified that she had some of the bruises for "a good two and a half weeks" and that as of the time of trial, she still had a little discoloration on her lower leg from one bruise. She had pain associated with the bruises.

On the night of the incident, her door was destroyed. The frame was pulled apart from the house and the door could not close or lock. The police officers called emergency maintenance to come fix the door. Before the maintenance man arrived she rolled her kitchen island to the front door location to prop the door and give some resistance in case Defendant came back.

Photographs of the broken door were admitted into evidence at trial. The photographs depict the damage caused by Defendant and show that he kicked the door so hard that the paint was ripped off the inside wall near the door jamb. There were shards of wood everywhere and metal parts of the lock were on the floor. The door jamb and frame broke both vertically and horizontally and had to be held together by screws and caulk until a new one could be obtained. One of the photos showed Defendant's footprint on the door.

In addition to calling the police after the incident, Ms. Benites used her iPod to connect to the internet and text her sister, Hayley Campbell and also called her best friend, Luke Dubin. Ms. Campbell had been at the beach and rushed back after the

16

victim told her what happened. Ms. Benites contacted her sister because she hoped she could be there when she spoke to the police. She contacted Mr. Dubin because she was hysterical and needed someone else to be with her.

Ms. Campbell, her sister, came to the house but did not spend the night because she was too scared. Ms. Campbell waited until Mr. Dubin arrived before she left. Mr. Dubin stayed the entire night. He sat up and kept watch while Ms. Benites tried to sleep, however, she was unable to sleep. She got up about 7:30 A.M. on Sunday, July 21, 2013 and called ProtectCELL because they insure her phone and she needed to request a replacement.

The victim and Mr. Dubin decided to drive around Coatesville to see if they could find her car. Defendant's parents both live in Coateville, but at separate addresses. They looked at both addresses and did not find her car. They turned onto Lincoln Avenue and as they were driving past the Cool Bar, she looked in the parking lot and saw her car. The color is a very distinctive bright blue and she recognized it instantly. Mr. Dubin parked his car to block in her car and called 911 to report that they found the missing car.

While Mr. Dublin was on the phone with 911, Ms. Benites saw Defendant approaching from 4th Avenue. They stayed in Mr. Dublin's car with the doors locked. Defendant walked up to the vehicle they were in. Ms. Benites rolled down her window a crack and Defendant gave her the car keys and she rolled the window back up. Defendant motioned for her to open her car trunk, she said no and he walked away.

That night she did not want to stay at her house, so she went back to her house to pack a bag to stay elsewhere. When packing she noticed that the $300 she had stored in her jewelry was missing. Only she and Defendant knew it was there. The last day she

17

saw it there was the prior day, Saturday, July 20th. She did not take the $300 and no one else was in her bedroom other than Defendant.

The following day, Monday, July 22, 2013, she went to the emergency room at Brandywine Hospital because she was sore and wanted documentation of her injuries. Ms. Benites found her phone in the cup holder of her car. It was sweltering hot and it would not turn on. It was damaged. It looked like someone tried to pry off the back of the phone and the screen was all scratched up. She could not have access her cell phone messages until Thursday, July 25' 2013.

When the messages came through there were ten messages from Defendant asking for his belongings. When she could handle it, she took all Defendant's belongings that were at her house to his mother in Coatesville. She turned over fishing gear, a grill and everything that he was saying was his and his mother took possession of it.

Officer Howard Sipple[3] testified at trial. He has been an officer with the Caln Township Police Department for eleven years. Prior to that, he worked as an officer in West Grove and attended the police academy. His training included making observations of situations and people, including whether they are intoxicated. He had observed hundreds of intoxicated people prior to trial.

On July 21, 2013 he responded to a physical domestic call at 23 Bluff Road in Caln Township and encountered Ms. Benites. Based on his training and experience he did not believe that she was intoxicated. She was hysterical and it took the officers a while to calm her down enough for her to tell them what happened.

When he arrived on scene, Officer Sipple observed that the door frame was

---

[3] The testimony of Officer Sipple is located at N.T.; 6/10/14, pgs. 183-203.

18

broken into pieces on the floor and the door was pushed off the frame. Ms. Benites reported that she was in an argument with her ex-boyfriend and it became physical. She reported that Defendant crashed back through the door after she had closed and locked it. She tried to escape but he grabbed her by the hair and pulled her back into the house. Ms. Benites reported pain in her tailbone and the back of her head. She said that he took her car when he left.

In his experience with victims, Officer Sipple knows that bruising often develops after the fact. It might even take days for bruises to appear on a victim. Officer Sipple's partner, Officer Culbertson called the management office to have the door repaired/secured.

Officer Jason Culbertson[4] testified that he has been employed by the Caln Township Police Department for fourteen years. Prior to that, he attended the police academy and received additional training. His training included identification of people, including whether they are intoxicated. He has observed hundreds of intoxicated people in the past.

On July 21, 2013 he responded to a domestic dispute call at 23 Bluff Road in Caln Township and encountered Ms. Benites. Based on his training and experience he did not believe that she was intoxicated. He did not smell alcohol on her. She was very excited, upset and concerned. He observed that the front door frame and locking mechanism to the door were damaged. The locking mechanism was split. It was obvious that someone used force to enter the house.

Officer Culbertson testified that Ms. Benities told him that she and Defendant were

19

arguing. She kicked him out and locked the door. Thereafter, Defendant kicked the door back in and came inside. They had a physical confrontation and Defendant took her keys and car when he left. The officer did not observe any injuries on the victim but knows it is very common for bruises to appear at some point later after an incident like this.

Assistant District Attorney Anthony Rock[5] testified that he is currently employed by the Chester County District Attorney's Office. Mr. Rock's testimony did not address issues on appeal, so it is not summarized in this Statement.

Hayley Campbell[6] testified that Ms. Benites is her sister and they lived together on July 2013 at 23 Bluff Road, Thorndale, PA. On July 20, 2013, Ms. Campbell went to Ocean City, MD. On July 21, 2013 at about 3:30 A.M. Ms. Benites sent her a text via her iPod which came through as her email address to her phone. That was odd and alarming because she would typically hear from her via normal phone text messaging.

Ms. Campbell returned home because she was scared for her sister. Ms. Benites told her that Defendant had broken down the door, attacked her and stole her car. Ms. Campbell wanted to make sure her sister was all right. She arrived at the house at about 4:30 A.M. When she arrived she noticed that the foyer was a mess. The door had been kicked in, there were shards of wood all over the floor with dust. The foyer table had been moved around and it looked like there had been a struggle. It did not look normal. She also observed a big bootprint on the door. That bootprint was not on the door when she left for the beach. At the time of trial, almost a year later, there is still a faint bootprint

---

[4] The testimony of Officer Culbertson is located at N.T., 6/10/14, pgs. 245-251.

[5] The testimony of ADA Rock is located at N.T., 6/10/14, pgs. 204-211.

[6] The testimony of Ms. Campbell is located at N.T., 6/10/14, pgs. 211-235.

20

on the door.

She saw Ms. Benites in the living room and found her to be scared and frazzled. Ms. Benites told her that she had been thrown down and her back hurt. Their neighbor was with her and the emergency maintenance people were there to try to fix the door frame enough so that they could lock the door. When Ms. Campbell arrived, the neighbor left. About twenty minutes later Luke Dubin arrived.

Between July 21st and July 28th, 2013, Ms. Campbell observed bruises starting to appear on her sister. The bruises got bigger and bigger including a particularly nasty bruise that developed on her leg toward the end of that time frame.

Ms. Campbell testified that she knows a man by the name of Mo. He was an ex-boyfriend of Ms. Benities around July 20, 2013 and that they had remained friends as of that time.

Luke Dubin[7] testified that Ms. Benites is one of his best friends. He has known her for five or six years. During the early morning hours of July 21, 2013 he was in his apartment in Ephrata, PA when he received a phone call from Ms. Benites. She was hysterical, crying and upset. She had called him from her work phone, not her cell phone. She was not speaking in full sentences and was "very broken up." She told him that her house was broken into. He asked if she needed him to come down and she responded, "yes." The conversation lasted less than thirty seconds.

Mr. Dubin left his house within 5 minutes. His apartment is about an hour away from Ms. Benites' house and he arrived at about 5:00 A.M. He observed that the door had splinters missing from it and there were large screws holding the door jamb and

---

[7] The testimony of Mr. Dubin is located at N.T., 6/10/14, pgs. 235-245.

21

frame in place. The entryway was in disarray.

Ms. Benites was still upset and she told him that she was in pain. He observed bruising on her arm. He directed her to get some sleep since she was up all night. She went to her bedroom and he watched Netflix for five hours. She came downstairs about 10:30 or 11:00 A.M. and they discussed what happened. He observed bruising on her leg.

Around noon they decided to go look for her car in Coatesville. She saw her car in a bar parking lot. They needed to make some u-turns to get to the parking lot and then he used his car to block her car into the parking spot. They were concerned about Defendant's location and what his actions would be if he returned. Mr. Dubin called the 911 non-emergency line and asked for a Coatesville police officer to respond so that they could recover the car. They waited ten to fifteen minutes. Ms. Benites spotted Defendant walking toward them, so Mr. Dubin called the 911 emergency line.

Defendant walked up to the passenger side of the car, said something to Ms. Benites and dropped the keys through the crack in the window. He could not hear what was said between them. Defendant left before the police arrived.

Defendant is not challenging the conviction of simple assault, bodily injury caused under 18 Pa.C.S.A. § 2701(a)(1). Therefore, he acknowledges that his actions as set forth above resulted in the victim suffering bodily injury. Therefore, we must examine whether there was sufficient evidence that Defendant attempted by physical menace to put another in fear of imminent serious bodily injury

Applying the sufficiency of the evidence standard set forth above, viewing the

22

evidence in this case in the light most favorable to the Commonwealth, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to find every element of the crime beyond a reasonable doubt. There is no question that Defendant intentionally placed Ms. Benites in fear of imminent serious bodily injury through the use of menacing or frightening activity.

There were numerous physical altercations and struggles between Defendant and the victim including struggling in her bedroom, master bathroom and powder room before Defendant left the house. Ms. Benites locked the door knob and the deadbolt and probably believed the incident to be done. Defendant decided to violently crash through her double locked front door, got in her face saying, "What now, bitch?" The victim once again tried to escape his wrath and was holding onto the door jamb, as he was trying to pull her back into the house.

Instead of finally letting her go, Defendant grabbed her by the hair on the back of her head and yanked as hard as he could, which tossed her to the floor on her tailbone. Did he stop at this point? No. He continued to yell at her and kicked her so hard a couple of times that she slid across the floor and hit the bottom of the table with the back of her head. Did he stop at this point? No. As she was trying to crawl through the dining room to escape him, he stood over her and squatted down toward her. As Ms. Benites testified, when this was happening, she really thought she was going to die. She had never seen such hatred and black in someone's eyes. She really thought he was going to kill her.

Based upon the totality of the circumstances, it is abundantly clear that it was Defendant's intention to place Ms. Benites in fear of imminent serious bodily injury

23

through his use of menacing and frightening actions. Accordingly, it was proper for the jury to find Defendant guilty of simple assault, pursuant to 18 Pa.C.S.A. § 2701(a)(3).

## Cross Examination:

Defendant's remaining four issues on appeal concern his request to cross examine witnesses about an old ex-boyfriend of Ms. Benites.

Defendant's third issue on appeal is that

[t]he Court erred and abused its discretion by sustaining the Commonwealth's objection and denying Defendant the opportunity to cross-examine Jessica Benites on why she was concerned with telling her ex-boyfriend about the events which occurred between her and Defendant on July 21, 2013. This line of questioning is relevant to the case and its probative value outweighs any prejudicial value. The error complained of in this paragraph can be found at line 13 of page 130 through line 1 of page 131, in the notes of testimony dated June 10, 2014.

Defendant's fourth issue on appeal is that

[t]he Court erred and abused its discretion by sustaining the Commonwealth's objection and denying Defendant the opportunity to cross-examine Jessica Benites on whether she told her sister, Hayley Campbell, that Ms. Benites was concerned with telling her ex-boyfriend about the events with Defendant on July 21, 2013. The Court also erred and abused its discretion by denying Defendant the opportunity to generally cross-examine Ms. Benites on why she was concerned with her ex-boyfriend knowing about the events with Defendant on July 21, 2013. This line of questioning is relevant to the case and its probative value outweighs any prejudicial value. The errors complained of in this paragraph can be found between line 9 on page 131 through line 15 on page 138 from the notes of testimony dated June 10, 2014.

Defendant's fifth issue on appeal is that

[t]he Court erred and abused its discretion by denying Defendant the opportunity to cross-examine Hayley Campbell as to her state of mind and what she told Jessica Benites concerning whether Ms. Benites should tell her ex-boyfriend about Defendant staying with Ms. Benites on July 21, 2013. This line of questioning is relevant to the case and its probative value outweighs any prejudicial value.

24

The error complained of in this paragraph can be found between line 23 on page 217 through line 15 on page 225 from the notes of testimony dated June 10, 2014.

Defendant's sixth issue on appeal is that

[t]he Court erred and abused its discretion by sustaining the Commonwealth's objection and denying Defendant the opportunity to cross-examine Hayley Campbell as to whether Jessica Benites stayed with Ms. Benites' ex-boyfriend on July 21, 2013 or shortly thereafter. This line of questioning is relevant to the case and its probative value is not outweighed by the prejudicial value. The error complained of in this paragraph can be found between line 7 on page 227 through line 15 on page 233 from the notes of testimony dated June 10, 2014.

Pennsylvania law is well established in that "[t]he admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion.'" Commonwealth v. Towles, 2014 WL 5094266, 7 (Pa.2014), quoting Commonwealth v. Johnson, 42 A.3d 1017 (Pa. 2012), quoting Commonwealth v. Sherwood, 982 A.2d 483, 495 (Pa. 2009). "'A trial court has broad discretion to determine whether evidence is admissible,'" and a trial court's ruling regarding the admission of evidence "'will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.'" Commonwealth v. Belani, 2014 WL 4748045, 3 (Pa.Super. 2014), quoting Commonwealth v. Huggins, 68 A.3d 962, 966 (Pa.Super. 2013), app. denied, 80 A.3d 775 (Pa. 2013); and Commonwealth v. Minich, 4 A.3d 1063 (Pa.Super. 2010).

"In deciding admissibility of other acts, 'the trial court is obliged to balance the probative value of such evidence against its prejudicial impact.'" Towles, 2014 WL 5094266, 8, quoting Sherwood, 982 A.2d at 497. First, evidence must be relevant

25

before it can be considered for admission. Pa.R.E. 402 states that "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible."

Evidence of a relationship Ms. Benites has with Mo, an ex-boyfriend prior to the night of the incident, is not relevant to assist the jury in deciding the actions Defendant took that night. Even if Defendant was upset with the victim regarding her relationships with others, the only thing the jury could have gleaned from the evidence was a motive for Defendant's outrageous actions. Introducing that testimony would have been prejudicial to Defendant.

In addition, the evidence as to the discussions Ms. Benites had with her sister about how much to tell Mo about what Defendant did to Ms. Benities is also not relevant. These discussions took place after Defendant completed his actions. How another person would react to the news has no bearing on what Defendant did or did not do. Finally, where the victim stayed in the days following the incident also has no probative value and is not relevant to prove the actions Defendant took at the time of the incident.

It must also be pointed out that Defendant was attempting to admit some evidence about Mo, without allowing the jury to hear the entire context of the evidence. There was evidence that when the victim fell asleep, Defendant entered her bedroom, removed her underwear, perhaps engaged in some inappropriate conduct and then threw her underwear in her face. (N.T., 6/9/14, p. 5-7). The jury did not hear this evidence.

26

Much of this evidence came from text messages between the victim and her sister. At a pretrial hearing on June 9, 2014, this court ruled that this evidence and text messages were not admissible in evidence unless Defendant opened the door via his cross examination because the probative value was outweighed by the prejudicial effect. Some examples included a text message from the victim to her sister asking if she should tell Mo about the fact that Defendant "basically, molested me in my own drunken stupor?" and "I know he did stuff to me while I was half asleep." (N.T., 6/9/14, pgs. 63 and 71).

The arguments and court rulings regarding these evidentiary issues can be found in the following three sidebar discussions between the court and counsel:

> THE COURT: What are you talking about?
> MR. BAYLARIAN: I am talking about Text Message 16.
> THE COURT: Oh, they are numbered?
> MR. BAYLARIAN: And it says, I don't know what to tell Mo about it all."
> THE COURT: 16, here?
> MS. LEIGH: No, no, you're right.
> THE COURT: Says, "Yes, he staying at my feet."
> MS. LEIGH: That's a reference to the dog.
> THE COURT: IDK —
> MR. BAYLARIAN: What to tell Mo.
> I don't intend —
> THE COURT: Okay. We're reading the time line, goes from bottom to the top; right?
> MR. BAYLARIAN: Yes. Lower number, that text message is later in time.
> THE COURT: Got it. Give me a second.
> MS. LEIGH: Your Honor, the conversation, if you continue to read, very clearly, deals with the statement that your Honor has already ruled inadmissible.
> So it says, excuse me, "I don't know what to tell Mo about it all. I have a huge bruise on my ankle."
> And "I wouldn't tell him you let him stay."
> "I don't intend to, but what's gonna sound feasible."
> Then I guess it continues, "He showed up at our place in a drunken, angry stupor and kicked the door down."

27

"Do I tell him about the fact that" -- I don't think, given the fact that Mr. Baylarian is asking about this conversation, that you can take it out of context without the entire conversation. If he wants to get into it, I believe that opens the door.

MR. BAYLARIAN: I don't need the whole conversation, your Honor. I am going to go prior to.

THE COURT: Which lines are you trying to put in?

MR. BAYLARIAN: The only lines that would be relevant would be Line 16 through Line 13. I am not getting -- I am not getting past that.

MS. LEIGH: Well, I think it opens the door then for me to ask, why do you think Mo would be upset knowing the whole story?

MR. BAYLARIAN: We are talking, specifically, about, she says, "Don't tell him you let him stay." That's it. That's the context of the conversation at that point, the full context of the conversation up to that point.

MS. LEIGH: But that's not the full context of the conversation, if you read the following line.

THE COURT: The conversation before this, are there lines here which talk about the underwear and the concern that -- see, 50, would have happened earlier in time.

MS. LEIGH: Before that.

MR. BAYLARIAN: 50 was at 12:53. 16 would have been --

MS. LEIGH: What was before that, 16, so that's 4:53 a.m.

MR. BAYLARIAN: 4:53 p.m.

MS. LEIGH: You're right.

MR. BAYLARIAN: And 16 --

THE COURT: Here's the situation.

MR. BAYLARIAN: 7:30 p.m.

THE COURT: Okay. Here's the situation, Mr. Baylarian.

You are worried about certain matters coming in here. The Commonwealth agrees they can live without bringing them in. You are trying to cherrypick -- whoever this Mo is is someone that it's not just the issue of this man being in the house that night. I would think she would be worried about all of this. She thinks that maybe she was molested. "I know he did stuff to me, too, while I was half asleep. I got a couple marks on my chest. That's what really set the whole thing off. I woke up, like, fully with him suddenly throwing my underwear in my face, which I was wearing when I laid down."

I think maybe that's something she doesn't know whether to tell Mo or not.

MR. BAYLARIAN: But her sister specifically --

THE COURT: And immediately afterwards, do I tell him about the fact that he basically -- when she says, "I don't know what to tell Mo." A couple lines later she says, "Do I tell him about the fact that he, basically, molested me in my own drunken stupor."

28

Does she say that?

MR. BAYLARIAN: What do you mean?

THE COURT: That's what she is thinking.

So I don't think that you say, what about Mo, is kind of hog tying the Commonwealth in saying, why were you so upset about talking to Mo? Because I think I was molested that night. Because I woke up with him over me after he threw my underwear in my face, this and that.

To me, you might be opening the door here, so you make a decision if you want all of that to come in, or some of it.

MS. LEIGH: I would also point out, as Mr. Barraza did to me, Rule 106, that if an adverse party requests part of a writing, the other party is entitled to the introduction of the rest of it. In fairness, the context of the conversation has to be included to the jury. If she is saying she is afraid of Mo finding out about the bruises, about the sexual portion of it, I don't think that you can extract one part of the comments and not include the other.

THE COURT: My issue is it fair for you to be making it look like she is afraid to say that she let him stay there, when actually, she is probably afraid of the whole situation, telling Mo. It's a terrible thing that is set down here in this transcript of text messages.

MR. BAYLARIAN: But I think that she afraid to say that he stayed with her, talking about her relationship.

THE COURT: She might be. When you open that door, they are going to be able to get into this other stuff. So you decide whether it's worth it. I don't think it is. It just doesn't seem correct.

If you want to take this away, ask her, well, what was your relationship with Mo, I don't know what it was, that's a question about why wasn't Mo there, if he was your boyfriend. I don't know.

But you want to get into these texts, it's a distortion to say that that's -- I don't know what to tell Mo about it all. The word is all. So if you get into that, you are opening the door.

MR. BAYLARIAN: But, then, she follows it up with, I have a huge bruise on my ankle. She's not talking about --

THE COURT: I have ruled.

MR. BAYLARIAN: Okay.

(N.T., 6/10/14, pgs. 132-138).

THE COURT: Yes. What is your objection?

MR. BAYLARIAN: There's no objection.

I just want to make sure, I would like to cross-examine Miss Campbell as far as Mo goes, so I just --

THE COURT: As far as Mo goes? Didn't we go over this already?

29

MS. LEIGH: She hasn't even mentioned Mo.

MR. BAYLARIAN: Right. But she knows who he is.

THE COURT: Isn't that beyond the scope of direct?

MR. BAYLARIAN: No such thing as far as beyond the scope when it comes to cross-examination by the defense counsel. It's cross-examination. It's not objectionable.

THE COURT: On anything?

MR. BAYLARIAN: Yes, as long as it is relevant.

THE COURT: Okay.

MR. BAYLARIAN: So --

MS. LEIGH: But I would argue the relevance of it, then.

THE COURT: What are you -- let me just see what she said. He broke down the door and attacked her and stole her car.

MS. LEIGH: Which was not a word for word recitation of what the text said.

THE COURT: Oh, I know.

MR. BAYLARIAN: It's not impeachment. The only thing that the -- only text that I want to bring out, I don't even want to bring it out --

THE COURT: What line?

MR. BAYLARIAN: Line 15.

THE COURT: Fifteen or 115?

MR. BAYLARIAN: 15.

I am not even bringing up the text. It may come out if she says she doesn't -- she did not tell him.

I will give my offer. I would just ask her, did you ever tell your sister Jessica Benites that you should not tell Mo that Herb stayed with you.

If she says no, well, then I will refresh her recollection or impeach her with that one instance.

All I am trying to get out is her statement, her state of mind at the time that she should not be telling Mo that Herb was around.

THE COURT: What does that -- what does the sister's state of mind have to do with it?

MR. BAYLARIAN: Because it shows that she was concerned that Jessica should not say anything to Mo, which indirectly shows --

MS. LEIGH: What?

MR. BAYLARIAN: That they were concerned about Mo finding out about Herb being there.

MS. LEIGH: In that case, your Honor --

THE COURT: No. I believe that that's collateral, the sister's opinion of whether Mo should be in or not. We talked about what the victim said about Mo. And I told you where I would let them go if that was opened.

MR. BAYLARIAN: Right.

30

THE COURT: The sister's opinion of what to do about Mo isn't relevant; is it?

MR. BAYLARIAN: I believe that it is. Because it shows a motive and bias by the victim.

MS. LEIGH: I would say, if that was permitted, I would follow up with why did you not want to tell Mo.

My offer is that they would testify that they were afraid that Mo would become extremely upset with Mr. Mercado, if he knew what had happened.

MR. BAYLARIAN: This specific statement doesn't tell him that.

MS. LEIGH: It is has to be put in context.

THE COURT: In response to the victim's concern, I don't know what to tell Mo about it at all, and previously she talked about the sexual nature of their encounter, if there was one. So she talked about her underpants being thrown in her face, et cetera.

So she said that. And the fact that her sister says, well, don't tell him he was there. I won't tell him you let him stay.

MR. BAYLARIAN: Right.

THE COURT: That would be a good cover up for the big problem. That's how – that's what I look at here, Mr. Baylarian. You don't have much to work with, but I'm not going to create things that aren't so. That's the problem.

And you're making every effort that you can, but I just think that's misleading. Then that will leave the inference that, Mo's got a temper, and she has got another boyfriend, et cetera. But the real issue is, I don't care if she does have another boyfriend. But if this man found out about the really bad stuff that's in this transcript, which it's not in the record, so again it was –

MR. BAYLARIAN: The relationship would be off.

THE COURT: No. "I know he did stuff to me while I was half asleep." This is the victim talking to her sister about what the defendant did. I got a couple marks on my chest. That's what really sets the whole thing off. "I woke up like fully with him suddenly throwing my underwear in my fact which I was wearing when I laid down." Somewhere else it says boxer shorts. That's in the written statement.

So if you are going to get into Mo, the real issue is, she doesn't know what to tell him about it all. The girlfriend said, I don't know, yes, she said, yes, he is staying at my feet. I don't know what to tell Mo about it all. I have a huge bruise on my ankle. She is worried about Mo hearing about this whole thing. And the whole thing's not just partial stuff.

Do you have anything to add, Miss Thompson?

MS. THOMPSON: No.

THE COURT: That's fine.

31

MS. THOMPSON: I understand the Court's and Commonwealth's perspective, as far as looking at one part then. If we could make – if we could structure it as broadly as, I am not sure how we would do it without opening that.

MR. BAYLARIAN: Can I just ask the simple – I don't have to refer to the texts. I can just say, did you ever tell her not to tell anything to Mo?

THE COURT: And why did you tell her that?

MS. LEIGH: Exactly.

THE COURT: I don't think it's a safe place for you to go.

MR. BAYLARIAN: Can I ask about Mo at all? Just who he is, and if they were together at the time?

MS. LEIGH: I mean –

MR. BAYLARIAN: Again, I think –

THE COURT: You can say because does she have a boyfriend named Mo, something like that, is that what you mean?

MR. BAYLARIAN: Yeah. At the time, or was in a relationship with Mo at the time. That's it.

MS. LEIGH: I think that's a legitimate question, your Honor. They can ask whether she was in a relationship with somebody. If it goes to a motive only issue, we have – obviously, impeachment with this stuff becomes issues of completeness and context.

THE COURT: Right.

MR. BAYLARIAN: There is –

MR. BARRAZA: There is the issue with context with that question.

THE COURT: Okay.

MR. BAYLARIAN: Your Honor's ruling I can't use the text. I cannot use the text.

THE COURT: You can't use any of her advice to her about don't tell Mo. That's arrives as a text, the new technology is teaching us, the texts bring a whole new element to all of this. Okay.

(N.T., 6/10/14, pgs. 218-225).

MR. BAYLARIAN: Judge, I want to be able to ask potentially on the response whether or not Jessica stayed with Mo after these events. So when I say after these events –

THE COURT: You mean that night?

MR. BAYLARIAN: Two days later, three days later, four days later.

THE COURT: Any response? Any objection to that?

MS. LEIGH: I do object, your Honor. I don't see how it's relevant. I believe she has already testified that she stayed at her

32

house, her own house, that Mr. Dubin came over and she got some sleep.

What she did next, the next night, the next night, I don't really see how that's relevant.

MR. BAYLARIAN: She testified there was no relationship with Mo.

MS. LEIGH: No romantic relationship. She knew who he was. I believe said they –

THE COURT: I don't even remember what she said.

MR. BAYLARIAN: Ex-boyfriend. She said Mo was.

THE COURT: She said Mo, ex-boyfriend.

MR. BAYLARIAN: I asked if they were in relationship at the time. And she said, no.

THE COURT: What are you going to ask the sister?

MR. BAYLARIAN: I am going to ask her whether she knows Mo. Who is Mo to Jessica?

THE COURT: I didn't hear that part before.

MR. BAYLARIAN: Well – but it's a long those lines.

THE COURT: Well, let's get it specific. I didn't write it down. Maybe I did. I should have. I am getting tired. Does she know Mo?

MR. BAYLARIAN: Yes.

THE COURT: How do you know Mo?

MR. BAYLARIAN: Yes.

THE COURT: Okay.

MR. BAYLARIAN: And then if she says, no, to those things, I may ask – well, also what was the relationship on July 20th and 21st of 2013 between Mo and Jess?

THE COURT: If you know.

MR. BAYLARIAN: If she says yes.

THE COURT: If she says yes to whether she knows Mo?

MR. BAYLARIAN: Whether she knows Mo and whether – well, I am going to ask, how do you know Mo.

THE COURT: What was the relationship between on July 20th –

MR. BAYLARIAN: 20, 21 or thereabouts.

THE COURT: 20 to 21, if you know.

What else did you want to ask?

MR. BAYLARIAN: If whether Jess stayed with Mo afterwards potentially. I don't know if I am going to ask that.

THE COURT: No. It just doesn't feel right. It doesn't seem relevant. And it seems to be attacking the victim's relationship with other people. And we have got a broken door frame and we have bruises here. So I am really trying to focus on what happened this night.

MR. BAYLARIAN: And I am focusing on –

33

THE COURT: You are trying to say they were lies, the broken door frame and bruises?

MR. BAYLARIAN: I didn't say that. I am arguing the bruises. I am not arguing the broken door frame. I am arguing a lot of other things not necessarily true.

THE COURT: Do you have any concern about appellate issues if I say no to whether she stayed with Mo later that week?

MS. LEIGH: If you say, no, it –

THE COURT: Yes, if I say no, that's not coming in.

MS. LEIGH: No, your Honor. I don't see how what she did days later is relevant. Further, I think if the question is asked, did she stay there, my follow up will be, why did she stay there? Every indication that I have will be that her answer is going to be, I was afraid he was going to come back. I didn't know what he was going to do. I thought he was going to hurt me.

THE COURT: We can drag this out another whole day.

Is this your last witness?

MS. LEIGH: No.

THE COURT: How many more?

MS. LEIGH: We have Mr. Dubin and another officer.

MR. BAYLARIAN: I am actually okay.

THE COURT: Are you fishing, or do you know that she was staying with this guy?

MR. BAYLARIAN: It's in the texts.

THE COURT: What's in the texts that she stayed with him that week?

MR. BAYLARIAN: 40 days, "Are you going to Mo's?", which is from Hayley.

THE COURT: I, frankly, didn't read all of this. Because I thought we had disposed of it.

MR. BAYLARIAN: Then she questions, "Jess?" says, Jess response, "Yes."

MS. LEIGH: Well, that statement that says a future intent, "Are you going to Mo's?" Yes. That doesn't say that she is there, that she slept there; how many nights she slept there. And the information from the text is hearsay as well at this point.

I don't know how Mr. Baylarian is going to get that in, other than, again, if he is asking factual questions of a witness, then my factual –

THE COURT: No, I just wondered if he was just fishing.

MR. BAYLARIAN: I am not asking if you texted her, just generally, did she stay at Mo's, or intend to stay at Mo's.

MS. LEIGH: Then, again, I think that night, okay, that's a reasonable question. But I would still ask the follow up as to why.

MR. BAYLARIAN: I am fine if she is going to say because jess was afraid.

34

MS. LEIGH: Well, I would probably recall Jessica to say that.

MR. BAYLARIAN: That's fine.

THE COURT: All right. Let's bring them down.

You can say, do you know Mo? How do you know him? What was the relationship between the victim and Mo on July 20th, 21, if I know?

I don't know what she is going to say. If you feel compelled to say, did she stay at Mo's later that week, it's just – no, we're not getting into that. That's not relevant. We're getting off on a tangent.

MR. BAYLARIAN: That's denied?

THE COURT: What? Yes. Don't go down that path. We have to keep this reasonable.

And who knows what we'll hear. Maybe they were an item back – they were back on, I don't know.

I will let you ask those three questions. Know him, how and relationship, if you know, between the two of them on that weekend.

(N.T., 6/10/14, pgs. 227-233).

As set forth in the above sidebar exchanges between counsel and the court, Defendant's request to take this evidence out of context was appropriately denied. If Defendant opened the door to questioning in this context, the evidence about possible inappropriate sexual contact would have been admissible to explain why the victim hesitated in telling Mo everything that Defendant did to her that night. This evidence could have been extremely prejudicial to Defendant. By not getting into the issue of Mo, it focused the scope of the trial on the events of the altercations charged in the information. Therefore, excluding all of this evidence was proper and Defendant's allegations on appeal are without merit.

BY THE COURT:

PHYLLIS R. STREITEL,     J.

DATE: 3/2/15

Certified From The Record
This     3     Day of     Feb     2015
Deputy Clerk of Common Pleas Court